[No. 28227. Department One. April 10, 1941.]

A. R. PAULSON *et al., Respondents,* v. A. J. McMILLAN *et al., Defendants,* A. J. McMILLAN, *as Guardian ad Litem of Donald J. McMillan, a Minor, Appellant.*[1]

[1]Reported in 111 P. (2d) 983.

*Green & Burnett, John L. Vogel,* and *Eggerman & Rosling,* for appellant.

*DuPuis & Ferguson,* for respondents.

ROBINSON, C. J.—On December 23, 1939, Enita Mc-Millan, a nineteen year old girl, accompanied by a girl friend and by her fifteen year old brother, Donald McMillan, took her father's car and drove north of Seattle to cut a Christmas tree. When they returned home, they found that they had left the ax in the woods. Enita and Donald McMillan went back to get it. They returned to the city by way of Holman road, an arterial highway which is intersected by Twelfth avenue northwest. A. R. Paulson and wife were driving on that street, and the two cars collided in the intersection. A month after the accident, Enita Mc-Millan became Mrs. Foster.

Paulson and wife brought this action against her and her father and mother, A. J. McMillan and wife, for damages in the amount of $5,850. Enita McMillan Foster cross-complained for fifteen thousand dollars, later reduced by amendment to five thousand dollars. A. J. McMillan and wife cross-complained for damages to their car and with respect to medical fees and hospital bills expended by them on behalf of their minor children; and A. J. McMillan, as guardian *ad litem* of Donald McMillan, cross-complained with respect to

Donald's injuries for damages in the sum of twenty-five thousand dollars.

At the close of a jury trial, the following verdict was rendered:

"We, the jury in the above entitled cause, do find that neither party is entitled to recover against the other."

The defendants and cross-complainants moved for a new trial, which was denied, and a judgment entered dismissing the complaint and all cross-complaints. A. J. McMillan, as guardian *ad litem* of Donald McMillan, alone appeals, and, assigning errors of law, prays that his ward be granted a new trial. We quote from appellant's brief:

"This appeal is brought on behalf of Donald J. McMillan, a fifteen (15) year old minor, on the theory that he was not and could not have been a joint adventurer with his sister.

"ASSIGNMENTS OF ERROR.

"(1) The Court erred in refusing to give the following instruction to the jury, requested by appellant:

"'Under the laws of the State of Washington no person under the age of 16 years will be issued a license to operate a motor vehicle within the State. It is not denied that on the 23rd day of December, 1939, Donald McMillan was a minor of the age of 15 years. As a minor he is incapable of entering into an agreement and being under the age of 16 years at the time of the accident, he was not and could not be licensed to operate a motor vehicle in the State of Washington. You are therefore instructed that as a matter of law the negligence of his sister, Enita McMillan Foster, if any, could not be imputed to Donald McMillan, and if under these instructions you find that the Plaintiff was guilty of negligence proximately causing this accident, then you are instructed that your verdict must be in favor of Donald McMillan upon his cross-complaint and against the Plaintiff.'"

The foregoing assignment raises two questions: (1) Must one have, or be eligible to have, a driver's license in order to engage in a joint adventure by automobile? (2) Is a minor incapable of entering into that relation or status?

A joint adventure is in the nature of a partnership. The relations of the parties in each of such associations are so similar that their rights, duties, and liabilities are generally tested by the same rules. Some courts have gone so far as to say that a joint adventure is subject to exactly the same rules as a technical partnership. 30 Am. Jur. 679, § 5; 48 A. L. R. 1057; 63 A. L. R. 912.

It is, of course, unnecessary that every member of a partnership must be able and qualified to do every act required to further its general purpose. For example, one can undoubtedly be a partner in the business of manufacturing watches without being himself able to make a watch or the simplest part thereof. We can conceive of no reason why one who can neither legally nor actually drive an automobile cannot engage in a joint adventure with a person who can. In the instant case, Donald McMillan was legally incapable of driving an automobile, but he could cut down a Christmas tree or search for a mislaid ax.

The second question cannot be so summarily disposed of. The appellant's argument on this phase of the matter may be reduced to a syllogism, of which the major premise is that a joint adventure can only arise out of contract; the minor premise, an infant cannot contract; and the conclusion, that an infant therefore cannot be a party to a joint adventure. The conclusion must be true if the premises are sound.

The respondents do not question either premise, but content themselves with citing several of the seven or eight decisions in which this court has held an

undertaking to be a joint adventure and the parties thereto joint adventurers, although some, or all, of them were minors. Outstanding examples of this class of cases are: *Forman v. Shields,* 183 Wash. 333, 48 P. (2d) 599, and *Bates v. Tirk,* 177 Wash. 286, 31 P. (2d) 525. In *Bates v. Tirk,* the three persons held to be joint adventurers were, respectively, twenty, eighteen, and sixteen years of age. The appellant, in reply, points out that the question now under discussion was not raised, considered, or discussed in any of that line of cases.

■ The truth of the appellant's major premise cannot be questioned. His minor premise is stated in the requested instruction in these words: "As a minor he is incapable of entering into an agreement . . ." In our opinion, this premise is not sound. Our statute governing the contracts of minors (Rem. Rev. Stat., § 5829 [P. C. § 582]) reads as follows:

"A minor is bound, not only by contracts for necessaries, but also by his other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money and property received by him by virtue of the contract, and remaining within his control at any time after his attaining his majority."

A minor is, therefore, capable of making contracts. They are voidable, but, until avoided by disaffirmance, they are contracts nevertheless. Professor Williston says, in § 231 (p. 687) of his treatise on the law of Contracts (Rev. ed. 1936):

"Most of the disputed questions in the law of infancy turn upon the legal meaning of the word 'voidable' as applied to an infant's acts. *The natural meaning of the word imports a valid act which may be avoided, rather than an invalid act which may be confirmed, and the weight of authority as well as reason point in the same direction.*" (Italics ours.)

[*Plainly*, our statute so imports, for it says: "A minor is bound . . . by his . . . contracts, . . ."]

Later, in the same section, Professor Williston, after pointing out that the deed of an infant transfers title and that the endorsement of negotiable paper by an infant payee or endorser transfers title, and therefore the infancy of an endorser is no defense to an action by the holder against the maker, goes on to say:

"Now inasmuch as the performance of the contract by the infant or his liability for non-performance are wholly dependent upon his own choice until and unless he ratifies the contract after coming of age, it might seem accurate to say that there is until then no contract. But though the distinction is doubtless fine between no contract and a contract which the promisor may perform or not at his pleasure, it is of legal importance. In the case of a note or formal document this is obvious. If the note has no validity until confirmed it is hard to explain how it can be negotiated, . . . If an infant's executory promise amounted to nothing until ratified, it is impossible to see how it could be consideration for the counter-promise of an adult, but that it is so was early and conclusively settled."

Appellant, in his brief, quotes at length from a scholarly and valuable article on the Washington Guest Statute appearing in Volume XV, No. 2, of the Washington Law Review and State Bar Journal, at page 87. The crux of the quotation, in so far as it relates to our present inquiry, lies in the following:

"A status or relationship must certainly stand or fall with the contract which creates it, and since the infant's contract is not binding, no legally significant relationship could flow from it; . . ." (p. 98)

But the status of partnership must surely require at least as formal a contract for its creation as does the status of joint adventure, and, as was said in

*Bush v. Linthicum,* 59 Md. 344, and reaffirmed in *Latrobe v. Dietrich,* 114 Md. 8, 78 Atl. 983:

*"All the books upon partnership lay down the proposition that an infant may become a partner with an adult.* It is a contract not absolutely void, but one which the infant may stand to or repudiate, at his election. While he remains a partner he has the rights and powers of a partner. He has equal right, with his copartner, to the possession of the assets of the firm, to collect the debts due it, and he has also the power to contract debts in the name of the firm, which though he may himself subsequently repudiate, and get rid of personal responsibility therefor, are still binding upon his copartner." (Italics ours.)

The opinion in the *Dietrich* case, in addition to quoting the above excerpt from the *Linthicum* case, further says:

"A contract of partnership between an infant and an adult is not void, but only voidable. The infant can avoid it, but the adult cannot rescind it, unless there be some ground for it other than the mere infancy of his partner."

In *Avery v. Fisher,* 35 N. Y. 508, the supreme court of New York quoted and adopted the opinion of the lower court as follows:

" 'The indebtedness of the firm of Hunt & Avery to the plaintiff was satisfactorily established. One partner has by virtue of the partnership relation, authority to transfer partnership property in payment of a partnership debt. An assignment made for that purpose by one partner in the partnership name, is binding upon the partnership. (*Everit v. Strong,* 7 Hill, 385; *Mabbett v. White,* 12 N. Y., 442; *Graser v. Stellwagen,* 25 id., 315.) The fact that the copartner who made the assignment in this case was at the time an infant does not invalidate the assignment, for the reason that infancy is a personal privilege, and no one but the infant can take advantage thereof (*Slocum v. Hooker,* 13 Barb., 537); and for the further reason, that

infancy does not incapacitate a person from becoming the agent of another. *Where a partnership is created between an adult and an infant, the relation of mutual agency, growing out of the partnership relation, exists to the same extent as if both the parties were adults.* The contract of partnership being legal and binding *per se* upon the adult and equally so upon the infant until disaffirmed by him, it follows that the partnership must be bound by the act of the infant partner at any time before an actual disaffirmance by him of the partnership agreement." (Italics ours.)

In *Continental Nat. Bank v. Strauss,* 137 N. Y. 148, 32 N. E. 1066, the New York court of appeals said:

"*There can be no question but that an infant may become interested in business as a general partner. Nothing forbade it at common law and nothing in the statutory law now forbids it.* . . . Infancy does not disable one from entering into contracts and so long as the infant does not avail himself of the privilege to set up his infancy in bar of, or to avoid, an obligation, his position and his acts are as those of any responsible person." (Italics ours.)

The court of appeals of our own ninth circuit said, in *Jennings v. Stannus & Son,* 191 Fed. 347, 112 C. C. A. 91:

"It follows that the partnership, where a member of the firm is a minor, continues in all respects valid until the minor had declared his privilege and has withdrawn from the firm."

In *Kuehl v. Means,* 206 Iowa 539, 218 N. W. 907, 58 A. L. R. 1359, where all of the contracting parties were minors, the court said: "This partnership had a legal existence." See the note following this case in 58 A. L. R., at page 1366, for additional citations to the same general effect.

We find no dissent from the proposition that a minor may, by contracting with an adult, or even with other minors, create a partnership status. There would

seem to be even more reason to apply the same rule to joint adventure. That status, in most instances, contemplates an undertaking of a mere temporary nature, often fully executed and completely performed in a single day. The instant case is typical of the majority of such cases which come to this court. Assuming for the present purpose that Enita and Donald McMillan were joint adventurers, Donald had not in any way disaffirmed the relationship, but was in the very act of performing his contract when the collision occurred and prevented all further performance. If there was a contract between him and his sister, no obligation remained for future performance or disaffirmance.

The court did not err in refusing to instruct the jury that Donald McMillan was so far incapable of entering into an agreement that he could not become a party to a joint adventure. Whether or not he made such an agreement and achieved such a status is raised by appellant's third assignment of error:

■ "(3) The Court erred in giving its instruction number 17 to the jury as follows:

" 'You are instructed that under the law of the State of Washington, Donald J. McMillan and Enita McMillan Foster were engaged in what is known as a "joint adventure" or "common enterprise," and if you believe under the evidence that the driver Enita McMillan Foster was guilty of negligence which contributed proximately to the happening of the accident, then I instruct you that said negligence is imputed and charged to her co-adventurer Donald J. McMillan and that neither the driver nor her co-adventurer could recover.' " (Italics ours.)

The alleged error is contained in that portion of the instruction which we have italicized. Here, the court instructed the jury, as a matter of law, that Donald and Enita McMillan were engaged in a joint adventure. If there be any justification for such an instruction, it

must be found in the evidence given by Enita Mc-Millan Foster. Donald McMillan threw no light on the matter other than saying that he went with his sister to get the ax. In our opinion, the disposition of the appeal turns upon that portion of Mrs. Foster's testimony which relates to the question of joint adventure. We therefore quote it in full:

"Mr. DuPuis: . . . I forget if I asked you this question yesterday or not—you had been out to get an axe that you and your brother had been using to cut Christmas trees with? A. Yes. Q. And your brother was with you on the first trip getting the trees? A. My brother and my girl friend and I had gone out together. Q. To get a Christmas tree for your family home for the holidays? A. Yes. Q. And your brother helped in getting the tree, I suppose? A. We got no tree. Q. Oh, you didn't get it. Well, you went to look for one and couldn't find one? A. Yes. Q. But you inadvertently left the axe? A. Yes. Q. And you with your brother were going back and get it to bring it back to your parents? A. Yes. I had driven back out and he had gone with me. . . . By Mr. Burnett: Q. Just one minute, Mrs. Foster. Regarding the first trip for the Christmas tree, who had permission to take the car? A. I did. Q. Did your brother? A. No; he didn't. Mr. Burnett: That is all. By Mr. DuPuis: Q. Was your brother present when you started out on the first trip? Just as long as that has been opened up let's get all the facts. Tell the court and jury how you happened to go on the first trip for this Christmas tree. Let's have all of the facts, please. A. I wanted to go out and get the tree because I have always liked to go out and get them, and my brother usually goes out along to chop it down for me. Q. It was a Christmas tree for the family to be decorated at your home? A. Yes. Q. For the holidays; and you and your brother were both living at home? A. We were; yes. Q. And you asked your brother to come with you? A. Yes. Q. And your dad and mother knew that your brother was going with you? A. They did. Q. To help you? A.

Well, I am not positive of that. Q. To whom did the axe belong? A. It belonged to my girl friend. Q. It belonged to your girl friend; and where did you get it that day? From your girl friend's house? A. Yes. Q. And you were both going to get it to return it to her? A. Yes. I had gone out to get it. MR. DuPuis: That is all. THE COURT: Just a moment. May I ask you a question? Did your brother drive the car at any time? THE WITNESS: No; he didn't. . . ."

We see nothing in this evidence to warrant the court in holding, as a matter of law, that Enita and Donald McMillan were engaged in a joint adventure. In our opinion, there was not even sufficient evidence in the record to carry that issue to the jury. There is no evidence of any contract. We are mindful of the fact that such a contract need not be express, but

"The *sine qua non* of the relationship is a contract, whether it be express or implied. As a legal concept, a joint adventure is not a status created or imposed by law, but is a relationship voluntarily assumed and arising wholly *ex contractu*. The essence of a contract is that it binds the parties who enter into it and, when made, obligates them to perform it, and failure of any of them to perform constitutes, in law, a breach of contract. A mere agreement, or concord of minds, to accompany one another upon an excursion, but without an intent to enter into mutually binding obligations, is not sufficient to create the relationship of joint adventure." *Carboneau v. Peterson,* 1 Wn. (2d) 347, 374, 95 P. (2d) 1043.

There is no evidence from which it can be implied that this brother and sister entered into any mutually binding obligations. Enita McMillan, accompanied by her girl friend and her brother, went out to cut a Christmas tree, the girl friend furnishing the ax. She testified, while under examination by adverse counsel, and there is nothing to contradict or enlarge it:

"I wanted to go out and get the tree because I have always liked to go out and get them, and my brother

306

·usually goes out along to chop it down for me. . . ,
Q. And you asked your brother to come with you?
A. Yes."

When they got home, they found that they had left the ax in the woods. Is it to be implied that the sister and brother thereupon entered into mutually binding and enforcible covenants to go out and retrieve it? If so, from what known facts? If we are to speculate about the matter, and in the absence of evidence we can do nothing else, it would seem more likely that, upon the discovery, and particularly since they were sister and younger brother, Enita McMillan simply turned the car around and they went back to get it as a matter of course.

In *Lampe v. Tyrell,* 200 Wash. 589, 94 P. (2d) 193, a case decided before that of *Carboneau v. Peterson,* but nevertheless a very recent decision, all of the members of the court, sitting *En Banc,* concurred in the following statement:

"Such an agreement presupposes that each of the parties has an equal right to a voice in the manner of its performance and an equal right of control over the agencies used in its performance. We cannot believe that this status can be established by mere loose statements, with no thought of any contractual obligation, or that it can be formed by the mere purchasing of some item, such as gas or oil, there having been no previous agreement or understanding so to do. Neither do we believe that a common purpose is sufficient in itself to form this relationship, there having been no previous agreement to carry out the common purpose. The relationship of joint adventurer is a serious matter, and it should not be held that the parties thereto have assumed the liabilities attached to such an undertaking, without some definite indication of their intention so to do."

[It may be noted that the holdings in the *Carboneau v. Peterson* and *Lampe v. Tyrell* cases are but applica-

tions of the general principle previously announced in *Syverson v. Berg,* 194 Wash. 86, 77 P. (2d) 382.]

Moreover, there is a total want of evidence to the effect that Donald McMillan had any control over the agencies used in the performance, and in the absolute lack of any evidence to that effect it will scarcely be implied that a young woman, just about to be married, who had borrowed a car from her father to make a trip, would submit to the control of a fifteen year old brother as to the manner of its performance. The instruction complained of is clearly erroneous.

 The respondents, however, contend that, even if the instruction was erroneous, it was harmless error. This contention is made upon the ground that, under the family car doctrine, the negligence of Enita McMillan Foster (found by the jury's verdict) is, as a matter of law, imputable to her brother Donald. In the course of the respondents' argument, as it appears in their brief, it is said:

"He is a member of the family; he was riding with his sister on a family venture in his parents' automobile, and under the rulings of this court in *Shirley vs. American Automobile Insurance Co.,* 163 Wash. 136 [300 Pac. 155], and [*Hurley v. Spokane*], 126 Wash. 213 [217 Pac. 1004], each member of the family must bear blame with the others and the negligence of one is the negligence of the other."

These cases do not hold that the negligence of one member of a family will be imputed to another. The negligence was imputed, not on the theory of family relationship, but upon the theory that the members of the family were at the time engaged in a joint enterprise. We quote from the opinion in the *Shirley* case, italicizing the reason for the imputation:

"The other member of the Shirley family who was awarded a judgment is barred from a recovery *because the excursion of the family during which the*

*accident occurred was the joint enterprise of the family in which all participated,* and in which each one must bear the fault and blame of the others."·

That this is also the ground for the decision in the *Hurley* case, appears from the following excerpt from that opinion:

"But it is said that to the appellant Gertrude Hurley cannot be attributed the contributory negligence of the driver, her brother. Here, however, the record shows that she and her brother were using the car with their father's permission on a common venture, and it therefore becomes immaterial who at the time may have been at the steering wheel."

In cases applying the family car doctrine, the result is not reached by imputing the negligence of the son, daughter, or other member of the family, to the parents. In the instant case, the jury found both drivers negligent. Had they found Paulson free from negligence, the plaintiffs would have been entitled to a verdict against Enita McMillan's father and mother, the owners of the car, under the family car doctrine, not because of the existence of *a* family relationship, but because the relationship was of such a character as to make the driver (Enita McMillan) their agent. Agency, not imputed negligence, is the basis of the family car doctrine, and the agency of the son or daughter for their parents is derived from the analogy of the relation of parent and child to that of master and servant.

What we have said in the preceding paragraph will be immediately recognized as sound upon an examination of the decision which originally adopted the family car doctrine and made it a permanent part of the jurisprudence of this state. *Birch v. Abercrombie,* 74 Wash. 486, 133 Pac. 1020, 50 L. R. A. (N. S.) 59. The opinion in that case was written by the late Judge

Ellis. With his usual thoroughness and clarity, he made it emphatically plain that agency, not family relationship, is the foundation of the doctrine. We quote briefly:

"It must also be conceded that a parent is not liable for the torts of his child solely on the ground of relationship. The liability, if any exists, must rest in the relation of agency or service." (74 Wash., at page 491.)

After pointing out that the daughter in that case was using the car for the very purpose for which the father owned it, kept it, and intended that it should be used, the opinion continues:

"It was in every just sense being used in his business by his agent. There is no possible distinction, either in sound reason, sound morals, or sound law, between her legal relation to the parent and that of a chauffeur employed by him for the same purpose."

But the relation of brother and sister in no way resembles that of master and servant, and we know of no case anywhere which holds that a brother is, by mere virtue of relationship, the agent of his sister or vice versa.

The respondents contend that Donald McMillan was shown to be guilty of contributory negligence as a matter of law. The appellant urges that this question was not raised in the lower court and therefore cannot be raised here. However that may be, we have read the evidence and find that it does not support the contention.

The judgment is reversed, and the cause is remanded with direction to grant a new trial upon the cross-complaint of A. J. McMillan, as guardian *ad litem* for Donald McMillan.

MAIN, STEINERT, BLAKE, and DRIVER, JJ., concur.